NO. 07-07-0383-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

JUNE 4, 2009

______________________________


RONNIE DUANE MASON, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_________________________________


FROM THE 47TH DISTRICT COURT OF POTTER COUNTY;

NO. 50,138-A; HONORABLE HAL MINER, JUDGE

_______________________________


Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.


OPINION

 
“The greatest dangers in liberty lurk in insidious encroachment by men of
zeal, well-meaning but without understanding.” United States Supreme Court
Justice Louis D. Brandeis.



          Appellant, Ronnie Duane Mason, was convicted by a jury of capital murder. He was
then sentenced by the court to an automatic life sentence, the State having waived the
death penalty. Appellant’s eight issues on appeal can be distilled down to a single
question: Did the trial court commit reversible error by denying Appellant’s pretrial motion
to quash the indictment when the State concedes that the indictment was obtained as the
result of a proceeding that violated articles 20.011


 and 20.04


 of the Texas Code of
Criminal Procedure


 governing grand jury proceedings? Finding both error and harm, we
reverse and remand.
 

Background
          On June 28, 2004, the Amarillo Police Department and Emergency Medical Services
responded to a 911 call concerning a baby not breathing. When Officer Kenneth Jester
arrived, there were three adults present: Anthony Richards, Kresha Ryan, and Appellant. 
The baby the subject of the emergency call was eight-month old Iveyonna Durley. 
Immediately following first care response, the baby was transported by ambulance to the
hospital where she was declared dead on arrival. An autopsy determined the child’s death
to be the result of multiple blunt force injuries.
          During the initial investigation, Richards indicated to the officers that, while he was
alone with the baby in his care, she had rolled off a bed and struck her head on a baby
walker. Richards further indicated that Appellant and Ryan subsequently arrived and
noticed the baby was not breathing, at which time Ryan called 911. Jester permitted
Appellant and Ryan to leave the scene in order to locate the infant’s mother at her place
of work, while he turned Richards over to members of the Special Crimes Unit for further
questioning. Richards was subsequently placed under arrest. 
          During the investigation, Richards gave two oral statements and two written
statements to police indicating that, while the infant was in his care, she had fallen from the
bed and struck her head on the walker. He also told police that, after Ryan arrived, he
picked the infant up, shook her a little and hit her in the face while trying to awake her. 
          Following his arrest, Richards’s mother called Sergeant Kevin Dockery, Lead
Investigator for the Special Crimes Unit, and told him that Richards had lied to investigators
in order to protect his cousin, the Appellant. She also told him to look at a mop handle
found in the apartment. Tashana Smith, Richards’s cousin, told Sergeant Dockery that
Richards told her that Appellant assaulted the infant with the mop handle, kicked the infant
from behind, and hit the infant in the head with his fist. Sergeant Dockery subsequently
discovered Appellant’s fingerprints on the mop handle and began to consider him as a
suspect. 
          In a series of interviews with Sergeant Dockery, Appellant indicated that, on June
27th, he had disciplined the baby by spanking her bare buttocks. He also indicated that,
while he was cleaning the apartment on June 28th, he accidently hit the baby in the head
twice with a mop handle–once when he threw the mop across the room and a second time
when he was attempting to frighten the infant into behaving. Based upon these
conversations memorialized by written statements, Sergeant Dockery obtained a warrant
and placed Appellant under arrest. Thereafter, Sergeant Dockery neither spoke with
Appellant nor Richards until the Grand Jury met to determine whether to indict Appellant.
          On January 13, 2005, after being incarcerated for more than six months, Richards
met with J. Patrick Murphy, Assistant District Attorney for the Potter County District
Attorney’s Office. With his attorney present, Richards agreed to go before the Grand Jury
that day and give his eyewitness account of the events that occurred on the day of the
child’s death. Before the Grand Jury, Richards recanted his earlier statements, testified he
had lied to the police to protect Appellant, and he then described how Appellant was
responsible for all the infant’s injuries. 
          More specifically, during Murphy’s examination of Richards, Sergeant Dockery, and
Mike Crandell, a Crime Scene Investigator for the Special Crimes Unit, questioned
Richards regarding a number of evidentiary details found at the crime scene that were not
covered by Murphy. In several instances, Sergeant Dockery’s questions were leading and
suggested the answers to Richards. Sergeant Dockery also attempted to rehabilitate
Richards’s testimony by obtaining Richards’s admission he had lied to the police and
should be punished for being present but not helping the baby. Sergeant Dockery also
elicited new testimony that Richards had told Appellant to stop injuring the baby and, when
Richards testified that he never hit or fought Appellant to protect the baby, Sergeant
Dockery bolstered his testimony by agreeing that the police “wouldn’t expect [Richards] to
get into a fight with [Appellant]” in order to protect the baby.
          Sergeant Dockery also followed up on a Grand Juror’s question related to a cell
phone call which Richards claimed in his earlier statements had occurred prior to Ryan’s
911 call. In his earlier written statements, Richards had indicated he was alone with the
baby when she was injured and that he called Appellant’s cell phone to inform him there
was something the matter with the baby’s breathing. Following the call, Richards indicated
Appellant returned to the apartment with Ryan, discovered the baby had ceased breathing,
and Ryan called 911. Before the Grand Jury, however, and in response to Sergeant
Dockery’s questions, Richards offered new testimony that he had lied about the call and
Appellant simply returned to the apartment as expected. Finally, Sergeant Dockery further
bolstered Richards’s testimony with the following statement:
All I can say is I do appreciate the fact you did come and talk to us, and I
appreciate the fact you stepped forward and talked to us. Hopefully you are
telling us the truth. And, all I can say, is good luck to you. 
 
          That same day, following Richards’s testimony, the Grand Jury indicted Appellant
for capital murder.


 Two weeks later, Richards was released on ten years probation in
return for a plea of guilty to injury to a child by omission.


 
          During the course of pretrial proceedings, Appellant filed motions for discovery of
the Grand Jury transcripts and materials. In support of his request for the transcripts, he
asserted that Richards was the only eyewitness to the events the morning of the baby’s
death and that he had recanted four earlier statements to police during his Grand Jury
testimony. Appellant also asserted the Grand Jury testimony was necessary to effectively
cross-examine Richards at trial. The trial court granted the motion.
          After receiving the transcript of Richards’s testimony, Appellant filed a motion to
quash the indictment because Sergeants Dockery and Crandell were present in the Grand
Jury room during Richards’s testimony and questioned him before the Grand Jury. On
August 20, 2007, the trial court held a pretrial hearing on Appellant’s motion to quash. At
the hearing, the State admitted the error but questioned whether articles 20.011 and 20.04
served any legitimate purpose. During that hearing, the State made the following
statement:
Well, to be honest with you, Your honor, the secrecy of the Grand Jury has
lost a lot of its impact as to why it was written as well. The question should
be–and I think is, if we’re allowed to have investigators in there to assist us
because they know the case better than anybody when it’s presented to the
Grand Jury, if we’re allowed to do that, the fact that they ask the questions
rather than the State, doesn’t make a lot of sense. The exact reasons why
they have the statute is lost on the State. I don’t know what the legislative
history is on it. 
 
          Murphy admitted that “[police] officers have always been [in the grand jury room],
as long–that’s been the practice from the–from the Potter County perspective as long as
I’ve been there.” He also admitted that typically the “Special Crimes people are there,” this
was the “rare occasion” where they had a witness, and they had developed some changes
in his testimony. At the conclusion of the hearing, the trial court found there was error but
overruled Appellant’s motion to quash after finding the State’s error was harmless.
          Following a six day jury trial, Appellant was found guilty of capital murder. Because
the State waived the death penalty, the trial court automatically imposed a life sentence. 
This appeal followed.
Discussion
          Appellant contends the State violated articles 20.011 and 20.04 by permitting
Sergeants Dockery and Crandell to attend the Grand Jury proceedings in a capacity other
than as witnesses and by improperly allowing the officers to question Richards. Appellant
contends the officers’ presence as well as their questioning of Richards impermissibly
influenced the proceedings and effectively commandeered the Grand Jurors in furtherance
of law enforcement’s investigation. Appellant also asserts that, unless these impermissible
practices are checked, the State’s violations will continue with impunity. Finally, Appellant
contends the error was not harmless.
          The State concedes that Appellant’s indictment was obtained following a violation
of articles 20.011 and 20.04. The State further concedes the trial court erred in failing to
grant Appellant’s motion to quash; however, it contends that error was harmless. The State
asserts that the error “derived from a misunderstanding of the procedural law [regarding
grand jury proceedings] rather than a deliberate disregard of that law.” The State further
contends the information exacted by Sergeants Dockery and Crandell was “only peripheral
for later prosecution purposes” and harmless to Appellant. The State relies heavily upon
three cases where an intermediate appellate court has found that the questioning of a
grand jury witness by an unauthorized person was harmless, State v. Smith, 36 S.W.3d
134, 137-38 (Tex.App.–Houston [14th Dist.] 2001, pet. ref’d); Sanders v. State, 978 S.W.2d
597, 600-01 (Tex.App.–Tyler 1997, pet. ref’d); and Hernandez v. State, 791 S.W.2d 301,
304-05 (Tex.App.–Corpus Christi 1990, pet. ref’d).
          I.        Article 20.011 – 1995 Amendment 
          In 1995, the Legislature amended the Texas Code of Criminal Procedure by adding
provisions intended to promote grand jury secrecy. See art. 20.011.


 One provision was
the requirement that witnesses could be present in the grand jury room while proceedings
were conducted if (1) they were being examined, (2) were necessary to assist the state’s
attorney examining other witnesses, or (3) were necessary to assist the state’s attorney in
his presentation of evidence to the grand jury. Art. 20.011(a)(4). Prior to the enactment
of these statutory provisions, the rule in Texas was that, when grand jurors were not
deliberating or voting, the presence of persons who had official business in the grand jury
chamber, such as police officers, was not discountenanced.


 Nevertheless, Texas courts
recognized that the “better practice is that only the prosecutor, reporter and witnesses
being interrogated be present.” Ex parte Rogers, 640 S.W.2d at 924.


 By enacting article
20.011 with the limiting language contained in subsection (a)(4), the Legislature apparently
adopted the “better practice” recognized by Texas courts for the purpose of promoting the
independence of the grand jury.
          II.       Article 20.04 – 1989 Amendment
          In 1989, the Texas Legislature amended the Texas Code of Criminal Procedure by
adding provisions permitting only the State’s attorney or a grand juror to question a witness
before a grand jury. See art. 20.04.


 What began as a single amendment to the Code of
Criminal Procedure


 intended to eliminate the, then, current practice of allowing police
officers to question witnesses during grand jury proceedings; House Comm. on Criminal
Jurisprudence, Bill Analysis, Tex. CSSB 208, 71st Leg., R.S. (1989),


 became an omnibus
grand jury reform bill aimed at eliminating grand jury abuse. See House Comm. on
Criminal Jurisprudence, Bill Analysis, Tex. SB 208 & CSSB 208, 71st Leg., R.S. (1989). 



See also Hernandez v. State, 791 S.W.2d 301, 305-06 (Tex.App.–Corpus Christi 1990, pet.
ref’d).


 Clearly, the intent of the Legislature was to protect the independence and
autonomy of the grand jury by prohibiting police officers from questioning witnesses. 
          III.      Harmless Error
          We agree that the trial court erred by failing to grant Appellant’s motion to quash;
however, we are still required to assess the harm, if any, arising from that error pursuant
to Rule 44.2 of the Texas Rules of Appellant Procedure. See Jasper v. State, 61 S.W.3d
413, 423 (Tex.Crim.App. 2001) (citing Tex. R. App. P. 42.2(a) as proper standard for
addressing constitutional error); Mosley v. State, 983 S.W.2d 249, 259 (Tex.Crim.App.
1998), cert. denied, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999) (citing Tex.
R. App. P. 42.2(b) as proper standard for addressing nonconstitutional error). 
          Although the right to a grand jury indictment is guaranteed by the Texas Constitution;
Tex. Const. Art. I, § 10,


 the failure to adhere to statutory procedures serving to protect this
constitutional provision is a violation of the statute, not a violation of the constitutional
provision itself. Chavez v. State, 91 S.W.3d 797, 800-01 (Tex.Crim.App. 2002); Ex parte
Long, 910 S.W.2d 485, 486 (Tex.Crim.App. 1995); Ex parte Sadberry, 864 S.W.2d 541,
543 (Tex.Crim.App. 1993). Although the language prohibiting unauthorized persons from
questioning witnesses before the grand jury is mandatory, “the violation of a mandatory
statute does not, by itself, call for the reversal of a conviction.” Ford v. State, 73 S.W.3d
923, 925 (Tex.Crim.App. 2002) (error in application of statutory protection subject to harm
analysis where protection does not fall within the very limited class of “structural” error
immunized from harm analysis). Therefore, because we are addressing statutory violations
of articles 20.011 and 20.04, we assess the harm, if any, pursuant to the standard for
nonconstitutional error found in Rule 44.2(b).
          Pursuant to that standard, any nonconstitutional error, defect, irregularity, or
variance that does not affect substantial rights must be disregarded. Tex. R. App. P.
44.2(b). A substantial right is affected when the error has a substantial and injurious effect
or influence in determining the jury's verdict. King v. State, 953 S.W.2d 266, 271
(Tex.Crim.App. 1997). Thus, a criminal conviction should not be overturned for
nonconstitutional error if the appellate court, after examining the record as whole, has fair
assurance that the error did not influence the jury, or had but a slight effect. Johnson v.
State, 967 S.W.2d 410, 417 (Tex.Crim.App. 1998). However, if pursuant to a harm
analysis of a nonconstitutional error, the court has “grave doubts” about the error's effect
on the outcome, it must treat the error as if it did. Burnett v. State, 88 S.W.3d 633, 637-38 
(Tex.Crim.App. 2002). 
          III.      Focus of Harmless Error Analysis
          A special problem of harmless error analysis is presented when the error consists
of a pretrial denial of a sanction or procedural advantage (e.g., dismissal of the indictment)
to which the defendant is entitled as a penalty for the violation of another legal requirement
(e.g., compliance with articles 20.011 and 20.04). In such a situation as this, the question
becomes, should the harmless error analysis focus on the failure to dismiss the indictment
(in which case the error would never be harmless because without an indictment clearly the
error has had a substantial and injurious effect or influence on the jury’s verdict); or, should
the analysis focus upon the triggering violation of the legal requirement giving rise to the
right to the dismissal? We believe the better reasoned analysis is to focus upon the
violation itself.
          Furthermore, the State’s failure to adhere to the dictates of articles 20.011 and 20.04
are violations affecting the grand jury process and not in any sense trial errors. Therefore,
in order to meaningfully conduct a harmless error analysis of such pretrial non-constitutional error, we must focus upon the violation in question and examine whether the
purpose of the statutes was thwarted by the error. See Ford, 73 S.W.3d at 925-26; Roethel
v. State, 80 S.W.3d 276, 281 (Tex.App.–Austin 2002, no pet.). In Ford, the Court of
Criminal Appeals assessed the erroneous denial of a jury shuffle by determining whether
the defendant was afforded a randomly selected jury. Finding that the purpose of the
statute was not thwarted by the error, the error was found to be harmless. In another case,
Johnson v. State, 72 S.W.3d 346, 348-49 (Tex.Crim.App. 2002), the Court held that a
violation of the requirement that a defendant execute a pretrial written waiver of a jury trial
was harmless because the record showed that the purpose of the statute - to ensure that
the defendant understood the right he was waiving - was accomplished without the writing.
          Similarly, when determining that a harm analysis focusing on the effect of the alleged
error on the grand jury’s decision to indict was appropriate when considering a violation of
Rule 6(d) of the Federal Rules of Criminal Procedure,


 regarding who was properly present
during a grand jury proceeding, Justice O’Connor, in a concurring opinion, wrote, “the
logical focus of the harmless error inquiry is an examination of the influence of the error on
the charging decision.” United States v. Mechanik, 475 U.S. 66, 76, 106 S.Ct. 938, 944,
98 L.Ed.2d 50 (1986) (Justice O’Connor, joined by Justices Brennan and Blackmun,
concurring). 
          While not expressly stating that this was the focus of their harmless error analysis, 
the three cases relied upon by the State have each reached a similar result. In Smith v.
State, the 14th Court of Appeals found that, although a violation of article 20.04 constituted
a deprivation of a “substantial right,” that error has harmless because the purpose of the
statute was not thwarted because the court could meaningfully gauge the effect of the error
by reviewing it in light of the rest of the witness’s testimony before the grand jury. 36
S.W.3d at 137. In Sanders v. State, the 12th Court of Appeals likewise held that, although
a person other than the State’s attorney or a grand juror questioned witnesses in violation
of article 20.04, that error was harmless because the improper questioning amounted to
nothing more than reiterations of earlier grand jury testimony that was “either redundant or
irrelevant.” 978 S.W.2d at 601. Finally, in Hernandez v. State, without any real harm
analysis, the 13th Court of Appeals held that where the appellant was indicted prior to the
amendment to article 20.04, the trial court was not required to quash the indictment where
unauthorized persons were permitted to question grand jury witnesses. In each instance,
the appellate court looked to the impact of the error on the grand jury proceeding, not the
trial on the merits. 
          Therefore, we must determine whether the violations of articles 20.011 and 20.04
“substantially influenced the grand jury’s decision to indict, or if there is ‘grave doubt’ that
the decision to indict was free from the substantial influence of such violations.” Bank of
Nova Scotia v. United States, 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)
(adopting the standard articulated by Justice O’Connor in her concurring opinion in United
States v. Mechanik, supra).  
          IV.      Application of Harmless Error Analysis
          In this case, the State concedes that allowing Sergeants Dockery and Crandell to
question Richards was error. Therefore, our analysis will focus on the harm caused to 
Appellant by this error as it pertains to the Grand Jury’s decision to indict Appellant. In
conducting our analysis, we review the questions and statements complained of appearing
in the record and then analyze the same in relation to the remainder of the witness’s
testimony before the Grand Jury, “thereby allowing this court to ‘meaningfully gauge or
quantify the effect of this error.’” Smith, 36 S.W.3d at 137 (quoting Sanders, 978 S.W.2d
at 600). Factors we include in this analysis include: (1) the source of the error; (2) the
nature of the error; (3) to what extent the error was emphasized by the State; (4) the error’s
probable implications; (5) how much weight a grand juror would probably place on the error;
and (6) whether declaring the error harmless would encourage the State to repeat it with
impunity. Harris v. State, 790 S.W.2d 568, 587 (Tex.Crim.App. 1989); Crocker v. State,
248 S.W.3d 299, 306 (Tex.App.–Houston [1st Dist.] 2007, pet. ref’d). The existence and
severity of these factors are indicative of the harm caused by the improper conduct. Wilson
v. State, 938 S.W.2d 57, 61 (Tex.Crim.App. 1996). No single factor is dispositive. Ex parte
Werne, 118 S.W.3d 833, 837 (Tex.App.–Texarkana 2003, no pet.).
          Here, the source and nature of the error is troubling. That the error emanated
directly from the State with the trial court’s, albeit reluctant, approval is significant to our
analysis. See Davis v. State, 195 S.W.3d 311, 318-19 (Tex.App.–Houston [14th Dist.] 2006,
no pet.); Werne, 118 S.W.3d at 837. See also Daniels v. State, 25 S.W.3d 893, 899
(Tex.App.–Houston [14th Dist.] 2000, no pet.). The trial court denied Appellant’s motion to
quash, after the State admitted error, stating that, under the applicable appellate standard,
a higher court would inevitably find the State’s error harmless.


 The harmless error rule
is a rule of appellate procedure and the rules of appellate procedure govern procedures in
appellate courts and before appellate judges. See Tex. R. App. P. 1.1. Therefore, the
determination of harm is a matter left exclusively to the appellate courts to be applied when
reviewing the effect of an error committed by the trial court. Salavar v. State, 118 S.W.3d
880, 885 (Tex.App.–Corpus Christi 2003, no pet.).
          Whether, and to what extent, the error was emphasized by the State is, in part,
subsumed in our consideration of the previous factor. But for the State’s effort to persuade
the trial court that the error was “harmless,” this issue would not now be before this Court. 
Only because Appellant was able to establish “particularized need” under article 22.02 was
he provided the Grand Jury transcripts bringing to light the violations in question. See
article 22.02(d), (e). Clearly, insofar as these statutory provisions were intended to protect
the impartiality and integrity of grand jury proceedings, our statutory scheme relies heavily
upon the integrity of the State in complying with the appropriate grand jury procedures. If
the State’s attorney fails to inform grand jurors that permitting police officers to
indiscriminately attend grand jury proceedings or permitting officers to question grand jury
witnesses is against the law, how are grand jurors to know? This is particularly so when
the State’s attorney is the person to whom the grand jurors logically turn for legal advice
and direction. To compound the harm arising from these violations by persuading the trial
court that any such error is harmless, is to place emphasis on the error in the worst way. 
          The error’s probable implications were that the Grand Jurors were prejudiced against
Appellant because Richards’s new testimony recanting four previous statements to police
was given imprimatur through direct questioning by Sergeant Dockery and, to a lesser
degree, by Sergeant Crandell. Unlike in Smith, supra, and Sanders, supra, Sergeant
Dockery’s questions were not redundant or duplicative of the questions asked by the
State’s attorney or Grand Jurors. Here, the questions were both unique and relevant. The
officers’ questions were leading and suggested to Richards facts related to the crime
scene. Significantly, Sergeant Dockery also attempted to rehabilitate Richards before the
Grand Jury by obtaining admissions that Richards had lied to police on four earlier
occasions, but was telling the truth now. The questions bolstered Richards’s credibility by
painting him as being repentant because he believed he should be punished for not helping
the baby. Sergeant Dockery then solicited new testimony that Richards had told Appellant
to stop, and he volunteered that the police wouldn’t have expected Richards to “get into a
fight with [Appellant] to protect the child.” Finally, Sergeant Dockery bolstered Richards’s
testimony by thanking him for testifying before the Grand Jury and expressed his
appreciation for Richards “stepp[ing] forward and talk[ing] to us.” Although Sergeant
Dockery made the statement that “[h]opefully you are telling us the truth,” he followed up
with a final, salutary comment, “[a]nd, all I can say, is good luck to you.”


 
          It is difficult to measure how much weight any Grand Juror placed on Sergeant
Dockery’s questioning of Richards and Richards’s responses because we are unaware of
any other evidence that was presented to the Grand Jury other than Richards’s testimony. 
However, despite the glaring inconsistencies of Richards’s previous statements to the
police, we surmise that Sergeant Dockery’s official presence as well as his efforts to
rehabilitate and bolster Richards’s testimony and credibility were successful because
Appellant was indicted the same day.



          Notwithstanding assurances to the contrary, there is also a substantial risk of
repetition of the State’s illegal conduct. That the State acknowledged the error below but
still attempted to persuade the trial court to deny Appellant’s motion to quash is indicative
that, absent direction, this type of error is likely to be repeated. See Garcia v. State, 919
S.W.2d 370, 381 (Tex.Crim.App. 1996) (finding error harmful based in part on risk of
repetition, noting that prosecutor offered and trial judge admitted evidence despite
knowledge of deficiencies); Daniels, 25 S.W.3d at 899-900. See also Werne, 118 S.W.3d
at 838. Given the extent and duration of the past policy of the Potter County District
Attorney’s Office to permit law enforcement to indiscriminately attend grand jury
proceedings and question witnesses despite statutes to the contrary, their present
assurance that unauthorized questioning will not occur in future grand jury proceedings
rings hollow.


 This is particularly so where the State, in argument before the trial court and
this Court, appears convinced that violations of these statutory procedures will always be
declared “technical” violations representing no more than harmless error. This, in and of
itself, is evidence that the State will repeat this error with impunity because two courts
found these statutory violations harmless. See Kelly v. State, 903 S.W.2d 809, 812
(Tex.App.–Dallas 1995, pet. ref’d).
          We cannot countenance the State’s purposeful violation of the law. The duty of
public officers to follow the letter of the law was aptly described as follows:
No man in this country is so high that he is above the law. No officer of the
law may set that law at defiance with impunity. All the officers of the
government, from the highest to the lowest, are creatures of the law, and are
bound to obey it. It is the only supreme power in our system of government,
and every man who by accepting office participates in its functions is only the
more strongly bound to submit to that supremacy, and to observe the
limitations which it imposes upon the exercise of the authority which it gives.
 
United States v. Lee, 106 U.S. 196, 220, 1 Sup.Ct. 240, 261, 27 L.Ed. 171 (1882). See
Terrell v. Middleton, 108 Tex. 14, 191 S.W. 1138, 1144 (1917); Thompson v. State, 12
S.W.3d 915, 925 (Tex.App.–Beaumont 2000, pet. ref’d) (J. Stover, concurring); Moses v.
State, 814 S.W.2d 437, 439 (Tex.App.–Austin 1991, pet. ref’d as untimely).
          We are mindful that a finding of harmful error here may mean this case will be tried
again. Regretfully, witnesses will be inconvenienced and the finality of justice sought by
those who were touched by this child’s death will be disturbed. Any benefit that society will
derive from rendering the just result in this appeal cannot, and will not, assuage the
suffering that a second trial may cause those close to the victim. Nevertheless, we are duty
bound to uphold the law and follow the old adage that “two wrongs do not make a right.” 
If the State is able to avoid a just result in this case, its prosecutors will be able to violate
these statutes with impunity and visit an injustice upon every citizen who comes under
scrutiny by a Potter County Grand Jury. The statutory protections, adopted by the
Legislature to level the field for an accused, will be substantially eroded and we will be at
risk of losing the benefit of statutory procedures intended to protect our constitutional right
to indictment if these violations are simply swept aside. 
          Regarding the cost of a second trial, if one follows, unfortunately this cost would be
borne by taxpayers who had no hand in the State’s error. This is particularly unfortunate
because the State’s error, as well as this possible cost, could have been avoided if the
State had simply obeyed the law. Something the State requires of its citizens on a daily
basis. 
          Having reviewed the record before us, we find that, no matter how well-meaning the
intent of the officers involved, not only is there evidence that the State’s violations likely
exerted a substantial influence on the Grand Jury’s decision, we have a “grave doubt that
the decision to indict was free from the substantial influence of [the State’s] violations.” See
generally Llamas v. State, 991 S.W.2d 64 (Tex.App.–Amarillo 1998), aff’d, 12 S.W.3d 469,
470-72 (Tex.Crim.App. 2000) (error found harmful because court unsure whether testimony
had a substantial or injurious effect on jury verdict). Accordingly, we find that the trial court
abused its discretion in denying Appellant’s motion to quash and the State’s violations of
articles 20.011 and 20.04 caused harmful error. Appellant’s issues are sustained.
 Conclusion
          The trial court’s judgment is reversed and the cause is remanded for further
proceedings consistent with this opinion. 
   
                                                                           Patrick A. Pirtle 

                                                                                 Justice



Publish.